```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                         HOUSTON DIVISION

 4  UNITED STATES OF AMERICA      §  CASE NOS. 4:18-CR-103-1
                                  §            4:18-CR-103-2
 5  VERSUS                        §            4:18-CR-103-3
                                  §  HOUSTON, TEXAS
 6  MARCELLE DA ROCHA GUIMARAES (1) §  FRIDAY,
    CARLOS OTAVIO GUIMARAES (2)     §  MARCH 2, 2018
 7  JEMIMA DA ROCHA GUIMARAES (3)   §  2:41 P.M. TO 3:03 P.M.

 8
                            BOND HEARING
 9
           BEFORE THE HONORABLE DENA HANOVICE PALERMO
10                  UNITED STATES MAGISTRATE JUDGE

11

12
         APPEARANCES:                      SEE NEXT PAGE
13
         CASE MANAGER:                     CAROL FELCHAK
14
         COURT RECORDER:                   SAMANTHA WARDA
15

16

17

18

19

20                    TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
            Tel: 281-277-5325 ▼ Fax: 281-277-0946
23               www.judicialtranscribers.com

24
         Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.
```

```
 1                        APPEARANCES:

 2

 3  FOR THE GOVERNMENT:           SHERRI LYNN ZACK, ESQ.
                                  U.S. ATTORNEY'S OFFICE
 4                                1000 LOUISIANA
                                  SUITE 2300
 5                                HOUSTON, TEXAS  77002
                                  713-567-9374
 6

 7  FOR CARLOS OTAVIO
    GUIMARAES (2):                RUSSELL HARDIN, JR., ESQ.
 8                                RUSTY HARDIN & ASSOCIATES
                                  1401 MCKINNEY
 9                                SUITE 2250
                                  HOUSTON, TEXAS  77010
10                                713-652-9000

11
    FOR JEMIMA DA ROCHA
12  GUIMARAES (3):                JAMES M. ARDOIN, III, ESQ.
                                  JONES WALKER, LLP
13                                811 MAIN STREET
                                  SUITE 2900
14                                HOUSTON, TEXAS  77002
                                  713-437-1811
15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1      HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 28, 2018; 10:11 A.M.
 2              THE COURT:  I'm going to call the case everybody
 3   wants to hear first, United States of America versus
 4   Carlos and Jemima Guimaraes, 4:18-CR-103.
 5              MS. ZACK:  Sherri Zack, on behalf of the
 6   United States, Your Honor.
 7              MR. HARDIN:  Rusty Hardin and Jimmy Ardoin, on
 8   behalf of the Guimaraeses.
 9              MR. ARDOIN:  Do you want us up there, Your Honor?
10              MR. HARDIN:  Do you want us to approach,
11   Your Honor?
12              THE COURT:  No, you can sit.
13              MR. ARDOIN:  Okay.
14              THE COURT:  Let's let the Defendants sit with
15   Counsel at the table.  I'm going to read my ruling.
16              MS. ZACK:  Your Honor, is there any concern that
17   there's no -- or is there a Portuguese Interpreter?
18              THE COURT:  No.  Mr. Ardoin, do you want to make a
19   statement for the Record on that?
20              MR. ARDOIN:  Yes, Your Honor.  We have agreed for
21   purposes of this hearing to continue as we did at the end of
22   yesterday's hearing.
23              THE COURT:  Hold on.  I'll be right back.  I won't
24   be able to do this without that.
25         (Pause/voices off Record.)
</pre>

1         THE COURT: Okay. Sorry.
2         MR. ARDOIN: No problem. Yes, Your Honor, we
3 are -- we have agreed to continue amongst the Defendants, as
4 we did on Wednesday where we left off at the end of that
5 hearing, without the Interpreter and Mr. Guimaraes will
6 interpret for his wife.
7         THE COURT: Okay. No problem with that?
8         MS. ZACK: No, Your Honor.
9         THE COURT: Okay. All right. This matter comes
10 before the Court on the Government's request to detain the
11 Defendants, Carlos and Jemima Guimaraes, pending the trial
12 of this matter. In consideration of that request, I'm
13 guided by several general principles.
14         First, at all times, the Defendants are presumed
15 innocent. Nothing that has taken place in this hearing --
16 or earlier hearing or this hearing or that I set forth in my
17 findings is intended or should be construed to affect that
18 presumption. Rather, the purpose of this hearing is to
19 determine whether, notwithstanding that presumption of
20 innocence, the Defendants should be detained pending trial.
21         Second, under the Bail Reform Act, pretrial
22 detention is an exceptional step. Under the Act, Defendants
23 must be released prior to trial unless I find that no
24 conditions or combination of conditions exist which will
25 reasonably assure the appearance of the Defendants at trial.

1  The Act requires that the least-restrictive conditions be
2  imposed that are necessary to provide those reasonable
3  assurances.  If I cannot find any conditions that will
4  reasonably assure the appearance of the Defendants as
5  required or the safety of the persons in the community, then
6  I am required under the Act to order that the Defendants be
7  held in custody.
8        In this case, the Government seeks to detain the
9  Defendants under Section 3142(f)(2) on the ground that they
10 are a flight risk.
11       Ms. Zack, I don't really understand that you're
12 arguing that they're a danger to the community, are you?
13       MS. ZACK:  Not necessarily, no, Your Honor.
14       THE COURT:  Thank you.  Okay.  The Government
15 argues that the Defendants should be detained because they
16 present a risk of flight and in this case, the Government
17 must show by a preponderance of the evidence that there are
18 no conditions or combination of conditions that will
19 reasonably assure the Defendants' presence as required.
20       Under the Bail Reform Act, I am requested to
21 consider four specific factors:
22       One, the nature and the circumstances of the
23 alleged offense;
24       Two, the weight of the evidence against the
25 Defendants;

1          Three, the history and characteristics of the
2  Defendant;
3          Four, the nature and seriousness of the danger to
4  others or the community.
5          I have considered all of the evidence on these
6  factors.  I have also given consideration to the Pretrial
7  Services Report.
8          Based on the information in the Pretrial Services
9  Report and the evidence presented here today, I find the
10 following:
11         The nature and the circumstances of the alleged
12 offense and the weight of the evidence are as follows:
13         Having found probable cause, the Grand Jury
14 has indicted these Defendants and their daughter,
15 Marcelle Guimaraes, who remains in Brazil, for violations of
16 18, U.S.C., Section 1204, conspiracy to remove a child from
17 the U.S. -- the minor child is the Defendants' grandson --
18 and also to retain that child outside the U.S. with the
19 intent to obstruct the lawful exercise of the child's
20 father, Dr. Christopher Brann, his parental rights.
21         In addition, the Indictment charges the Defendants
22 with intentional parental kidnapping, in violation of
23 18, U.S.C., Section 1204(a) and (2).
24         The Government presented evidence from a special
25 agent of the FBI who was assigned to investigate this case

1  starting in December 2015.  The Government established the
2  following:
3           The child was born on 9/14/2009 to Christopher
4  Brann and Marcelle Guimaraes in Harris County, Texas and is
5  a U.S. citizen.  They've offered Exhibit Number 6,
6  Government Exhibit 6.
7           Marcelle Guimaraes filed for divorce in Harris
8  County, Texas.  I don't have the exact date of the filing of
9  the divorce.
10          Marcelle Guimaraes entered into a Rule 11
11 agreement with Dr. Brann allowing her to take her son to
12 Brazil in July 2013 for her brother's wedding.  And that's
13 Government's Exhibit Number 8.
14          Under the Rule 11 Agreement, Marcelle Guimaraes
15 and her son were to return to the U.S. on July 20th, 2013.
16 Marcelle Guimaraes and her son did not return on July 20th
17 and still have not return.
18          Dr. Brann filed an emergency motion in Harris
19 County Family Court to modify the Temporary Orders.  On
20 August 9th, 2013, the Court granted Dr. Brann temporary
21 custody.
22          The Court further ordered that the primary
23 residence of their son shall be in Harris County, Texas and
24 that the parties shall not remove him from Harris County,
25 Texas or the surrounding counties.  Government Exhibit

1  Number 5.

2          The Court also entered a temporary injunction
3  against Marcelle Guimaraes that she shall not have
4  possession or access to her son, be in the presence of her
5  son or communicate with her son in any way.  It's in the
6  same exhibit, Number 5.

7          The Government introduced several documents that
8  were in Portuguese without providing an English translation
9  to establish that Marcelle Guimaraes premeditated keeping
10 her son in Brazil.  The documents include Government's
11 Exhibits 2, 3 and 4, which purport to be applications or
12 contracts for the son to attend school in Brazil.

13         Defendant Jemima -- it's not Jemima.

14         How do you say her name?

15         MR. ARDOIN:  It is Jemima Guimaraes, Your Honor.

16         THE COURT:  It is Jemima?

17         MR. ARDOIN:  Yes, Your Honor.

18         THE COURT:  Jemima Guimaraes is a part owner of
19 that school.  Exhibit 2 is dated before Marcelle Guimaraes
20 left the country with her son and Jemima Guimaraes is
21 purported to have witnessed that document, signing as a
22 witness to that document.  The Government offers the
23 document to show that Jemima Guimaraes participated with her
24 daughter in the illegal retention of her son in Brazil and
25 that she also premeditated these acts.

1        It is not clear from the evidence and these
2   untranslated documents what they were intended to
3   accomplish.  The evidence establishes that it's not unusual
4   for children to attend schools in foreign countries to learn
5   the language.
6        The evidence also established that
7   Marcelle Guimaraes' sister-in-law put her baby in the school
8   when she visited Brazil.  However, the sister-in-law did not
9   fill out any paperwork in advance of dropping her son at the
10  school.  If anything, this evidence could lead to an
11  inference that the application was required because the
12  child was not seeking to temporarily attend the school, but
13  to be admitted on a more permanent basis supporting the
14  Government's inference of a premeditation on the part of
15  both Marcelle Guimaraes and Jemima Guimaraes in the alleged
16  crime.
17       The Government introduced a document not in
18  English purporting to be either a job offer or a job
19  acceptance for Marcelle Guimaraes to teach at that school,
20  Government Exhibit Number 1.  Since it is not in English and
21  the testimony on it was uncertain, the Court does not give
22  this document any weight.
23       The Government also established that Carlos
24  Guimaraes communicated with Dr. Brann about Marcelle
25  Guimaraes and her son returning to the United States

1  providing several alternate dates and flight information for
2  when they would return.  They did not return on those
3  flights.  This is some evidence of Carlos Guimaraes'
4  participation in the alleged crime.
5       The Government established that Brazil does not
6  extradite its citizens, Government Exhibit Number 7.
7       The Government established that when Dr. Brann
8  realized that his son would not return, his lawyer and
9  Marcelle Guimaraes' lawyer spoke and informed Dr. Brann that
10 the child would not be coming home.
11      While this evidence may be sufficient -- while all
12 this evidence may be sufficient to establish probable cause,
13 that issue is not before this Court.  However, this is only
14 one side of the story.
15      The FBI agent did not provide on direct
16 examination any evidence relating to Marcelle Guimaraes'
17 affirmative defense under the International Kidnapping Act.
18 Under the statute, a defendant has an affirmative defense to
19 the crime if the Defendant was fleeing an incident or
20 pattern of domestic violence.  That's Section 1204(c)(2).
21      On cross, the FBI agent said that he was aware of
22 Ms. Guimaraes' allegations that she was subject to physical
23 abuse, but he did not find any supporting evidence.  He did
24 admit that he was aware of two pieces of evidence that
25 support that allegation, but he discounted them based on

1  Dr. Brann's explanation that he was just defending himself
2  against Marcelle Guimaraes' aggression and that he had no
3  choice but to hit her to get him [sic] off of him.  The
4  Court does not find this explanation to be credible in light
5  of the evidence.
6          On August 5th, 2012, before any divorce was filed,
7  Dr. Brann wrote his wife an email admitting that he had
8  physically assaulted her.  He admitted to pushing her on the
9  bed and floor, hitting her in the face and head with his
10 hand -- "hitting" was the word he used, not "impacting" --
11 pulling her hair, hitting two chairs against a table and all
12 of this occurred in front of their son who was home and
13 apparently in the room.
14          In addition, there is a doctor's record from
15 February 23rd, 2012 showing that Marcelle Guimaraes saw a
16 doctor for numbness, pain in her jaw and ear.  She said that
17 her husband had hit her in the face, hit her on the floor
18 and that there was domestic violence but that she did not
19 want to tell the police because they were in counseling to
20 save their marriage.  She had informed the doctor of her
21 husband's sex addiction.
22          The FBI agent testified and the Government argued
23 that the original divorce papers did not contain any
24 allegation of abuse.  The Court does not find this to be
25 material since parties often do not put all their dirty

laundry in the initial divorce filings.

Apparently Dr. Brann went to Brazil secretly, found a court there. He filed a petition under the Hague Convention. Ms. Guimaraes responded. Their Depositions were taken. The Court entered a long order that detailed each side's allegations and proof against the other.

In Defendants' Exhibit 1 starting on Page 210, the Court summarizes the evidence regarding domestic violence. It refers to records, emails, pictures, depositions and the parties' allegations. It states each side's evidence and concludes there is no doubt that the Defendant, meaning Marcelle Guimaraes, was victimized by domestic violence and that Plaintiff himself, meaning Dr. Brann, acknowledged such fact both in documents attached to the records and in his Deposition. That's at Defendants' Exhibit Number 1, Page 212. Both the case in Brazil and the Family Court case in Harris County are on appeal.

Defendants proffered that Jemima Guimaraes stayed in Houston with her daughter from November 2012 through July 2013 when Ms. Guimaraes went back to Brazil because she feared for her daughter's safety. Although they were already separated, the proffer was that Dr. Brann called Jemima Guimaraes and threatened her daughter. In addition, there was other evidence that at least one of the physical assaults occurred after they were separated.

1          Thus, the Court finds that there is ample evidence
2   suggesting that Marcelle Guimaraes was a victim of domestic
3   violence such that the Defendants could assert an
4   affirmative defense to the charges.  If the evidence,
5   according to the Defense, were found to be credible by the
6   Jury, the Defendants could be found not guilty.  So the
7   Government has shown that the Defendants may have
8   participated in the taking and keeping of their grandson,
9   but they have shown that Marcelle Guimaraes was subject to
10  abuse and therefore has a defense to the charges.
11         Given both sides' evidence, the Court finds that
12  the weight of the evidence against the Defendants is not
13  overwhelming.
14         History -- regarding the history and
15  characteristics of the Defendants, the Defendants have put
16  on evidence that they are highly respected people in both
17  the business and social community in both the United States
18  and Brazil.
19         Regarding danger to the community, there's no
20  credible evidence that the Defendants are a danger to the
21  community.
22         The Government argues that the Defendants are
23  wealthy and have sufficient means to flee.  The Court agrees
24  that they are wealthy and that any defendant that is so
25  inclined can easily flee the jurisdiction or go underground.

1         The question is: whether there are conditions that
2   could reasonably assure the Defendants' appearance?  The
3   Defendants have money.  The Defendants have dual citizenship
4   in both the United States and Brazil and they travel often.
5   They speak several languages.  And Brazil does not extradite
6   its citizens.  This is cause for concern.
7         On the other hand, the Defendants do have strong
8   ties to this community.  They are both U.S. citizens.  They
9   have a son, daughter-in-law and grandson here.  They own
10  property in Houston.  They have money in the United States
11  and they have friends in the United States and in Houston.
12        The Court finds that there are conditions that can
13  be established to secure their appearance:
14        I am setting a bond of $1.5 million each in cash;
15        They will be subject to a curfew;
16        They must reside in Houston, Texas with their
17  third-party custodians, their son and daughter-in-law;
18        They will be limited to travel in Harris County;
19        They may not visit any consulates, embassies,
20  consuls, airports, bus stations, train stations or other
21  means of mass transit;
22        They will also be subject to the other usual terms
23  of conditions of release including that they will have
24  third-party custodians and they have offered to have two
25  couples as their third-party custodians;

1            They will be supervised by Pretrial Services on a
2 schedule that Pretrial Services determines;
3            They -- Mr. Guimaraes will have to maintain his
4 employment.  I don't know that Mrs. Guimaraes is going to be
5 employable;
6            They must surrender their Brazilian passports to
7 Pretrial Services;
8            They may not obtain a passport or any other
9 international travel document;
10            They must abide by the restrictions on their
11 personal travel restrictions limiting them to Harris County
12 and not visiting the locations that I indicated;
13            They will be under a curfew and I will discuss
14 with the parties what would be a reasonable curfew.  I have
15 not set that;
16            They may not possess any firearm, destructive
17 devices or other weapons.  I assume the Defendants don't
18 have any of those.  If they do, they must be removed from
19 the home before they go in there;
20            They may not use alcohol excessively;
21            May not unlawfully possess any narcotic drugs or
22 other controlled substances unless prescribed by a licensed
23 medical practitioner;
24            They will be subject to location monitoring and
25 they will be required to pay for the entire cost of that;

1     And they'd be required to report as soon as
2 possible to Pretrial Services Office and every -- or a
3 supervising officer of every contact that they have with law
4 enforcement personnel including any arrests, questioning or
5 traffic stops.
6     That is my ruling. I understand that you want to
7 appeal. If you are unable to reach Judge Bennett today
8 because I understand that he may not be here, I will enter a
9 stay so that you can get him to do whatever.
10     MS. ZACK: If you could stay until Monday, the
11 close of business on Monday, we can have our documents filed
12 with Judge Bennett.
13     THE COURT: Okay. So we will enter a stay.
14 Nothing will happen today because she has the right to
15 appeal it and --
16     MS. ZACK: Is Your Honor going to make your
17 conditions and everything that you just read available to us
18 in written form?
19     THE COURT: I'm not going to make -- do you want
20 me to make the oral pronouncements available in written
21 form?
22     MS. ZACK: No, no, no. Is there --
23     THE COURT: The conditions of the release, yes.
24 So I will do a regular bond. We'll prepare a bond.
25     Do you want to discuss the curfew conditions or do

1 you want to just wait until appeal and then we can discuss
2 it at another time or how do you want to handle that,
3 Mr. Hardin?
4       MR. HARDIN: Your Honor, I don't know about the
5 time so we could talked among ourselves about a time before
6 we represent to the Court.
7       My inclination is for us to approach the District
8 Judge about asking him on the stay. We really would like to
9 get them out. We appreciate the detail and compassion of
10 the Court's Order. We certainly don't quarrel with the
11 conditions you've set, but they're coming up on four weeks
12 in jail.
13       THE COURT: I understand that. I just don't
14 know whether you're going to be able to get a hold of
15 Judge Bennett today, certainly not going to be able to get
16 him to rule on anything today because you're going to have
17 to file -- prepare and file papers and then make the
18 argument so.
19       MR. HARDIN: I understand. We will certainly
20 address that also among ourselves rather than -- I know
21 you've got other cases here in front of you. We'll talk
22 about that.
23       May I ask? May we use a surety for the cash bond?
24       THE COURT: What do you mean "a surety"?
25       MR. HARDIN: Well, you know, for instance if --

1  could we -- would it be possible for us to put down a cash
2  deposit and have a surety be responsible for the rest?
3  Because we don't know whether -- how long it's going to take
4  us to get that kind of money in cash, any kind of liquid
5  basis. That's my concern.
6          THE COURT: Yeah. "No," is the answer.
7          MR. HARDIN: So it's --
8          THE COURT: It has to be cash.
9          MR. HARDIN: So three -- you want $3 million in
10 the Registry of the Court?
11         THE COURT: Three million dollars in the Registry
12 of the Court. That is what is "skin in game." And once
13 they have that money deposited and you comply with the other
14 terms of release, they can go. But until that money is on
15 deposit, absolutely not.
16         MR. HARDIN: I learned --
17         THE COURT: Absolutely.
18         MR. HARDIN: I learned a long time ago when you've
19 gotten this -- part of what you want, it's probably a good
20 idea not to argue about the rest.
21         THE COURT: Right.
22         MR. HARDIN: So we accept the Court's ruling and
23 thank you very much.
24         THE COURT: And if you want to -- I have other
25 hearings obviously, but if you want to confer with your

1  clients, you can stay in the courtroom or the Marshals can
2  tell you if they need to go somewhere else.
3         MR. HARDIN:  They are -- well, now the Marshals
4  will take them back up to 10?
5         THE COURT:  And you can go there?
6         MR. HARDIN:  I don't know whether they -- the
7  Marshals are going to wait until everybody else is through.
8  I don't know what they can tell me about that.
9         THE COURT:  What do you want to do?
10         THE MARSHAL:  We can take them, that's fine.
11         MR. HARDIN:  You'll take them to 10?
12         THE MARSHAL:  Yes.
13         MR. HARDIN:  Then perhaps we can --
14         THE COURT:  You can take them up to 10?
15         MR. HARDIN:  -- rather than disrupt your court, we
16  can go to 10 with them.
17         THE COURT:  That's fine.
18         MR. HARDIN:  Thank you.
19         THE COURT:  And you're excused.
20      (Proceedings concluded at 3:03 p.m.)
21                          *  *  *  *  *
22         *I certify that the foregoing is a correct transcript to the best of my ability produced from the*
23  *electronic sound recording of the proceedings in the above-entitled matter.*
24  /S/ MARY D. HENRY
    CERTIFIED BY THE AMERICAN ASSOCIATION OF
25  ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337
    JUDICIAL TRANSCRIBERS OF TEXAS, LLC
    JTT TRANSCRIPT #58312          DATE FILED:  MARCH 9, 2018